UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER STEPHENS,

Petitioner,

Case No. 2:15-cv-10762

v.

HONORABLE STEPHEN J. MURPHY, III

STEVEN RIVARD,

Respondent.
_________________________________/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS** (document no. 1)**, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO APPEAL IN FORMA PAUPERIS**

## INTRODUCTION

The case sounds in habeas corpus brought pursuant to 28 U.S.C. § 2254. Following a jury trial in the Genesee County Circuit Court, prisoner Walter Stephens was convicted of first-degree felony murder, armed robbery, felon in possession of a firearm, and possession of a firearm during the commission of a felony. Mich. Comp. Laws §§ 750.316, 750.529, 750.224f, 750.227b. In 2012, he was sentenced to life imprisonment, a concurrent term of 20 to 40 years imprisonment, a concurrent term of two to five years imprisonment, and a consecutive term of two years imprisonment on those convictions. In his pro se pleadings, Stephens raises claims concerning the sufficiency of the evidence and the effectiveness of trial counsel. For the reasons below, the Court finds that Stephens is not entitled to habeas relief and will deny his petition. The Court will also deny a certificate of appealability and leave to proceed in forma pauperis on appeal.

## FACTS AND PROCEDURAL HISTORY

Stephens's convictions arise from the robbery and shooting death of a man in an apartment in Flint, Michigan in July 2010. The Court adopts the statement of facts set forth

by defense counsel on direct appeal to the extent that it is consistent with the record. Those facts are as follows:

> The Prosecution
>
> On July 7, 2010, near 12:45 p.m., Sergeant David Bender of the Flint Police was patrolling downtown Flint in a semi-marked car (TT I 251-253). Bender observed a panhandler and pulled behind an apartment building on Court Street where he observed a Chrysler Sebring in a parking area. *Id*. The doors and trunk of the Chrysler were closed and no one was near it (TT I 292-293). After about five minutes, Bender circled the block and returned to said building (TT I 253). This time, as he entered the parking area, he saw two people near the Chrysler (TT I 254). He testified:
>
> > There was two younger black males. The doors were open on the car. The trunk was open. And, as I pulled in front of them, I looked over to my right and they both had t-shirts on and they were both tied around their noses, that using as like [sic] a face mask (TT I 254).
>
> Bender pulled within 10 feet of the men and noticed the butt of a handgun sticking from one of their pockets (TT I 254). He did not see the men place anything inside the Chrysler (TT 1309-310). He could not recall if the car's engine was running (TT I 282). Bender made eye contact with the two men, who then ran as Bender radioed-in for help and pursued them (TT I 255). Bender admitted telling dispatch that he was pursuing two white males; he testified he misspoke (TT I 256-257).
>
> Bender apprehended one of the men at gunpoint - defendant - the man with the gun in his pocket (TT I 257, 259). The gun was unloaded but capable of holding six rounds (TT I 310). The gun was a revolver, so any fired casing would remain inside the gun's cylinder until extracted (TT I 322-323). The gun was unregistered (TT I 311). Defendant had his shirt off (TT I 258). As Bender placed defendant in custody, Bender saw Officer Howell pursuing the other man, Curtis McCloud (TT I 262, 300-301).
>
> Bender returned to the apartment building and found a large flat screen television inside the trunk of said Chrysler (TT I 264). A latent print examiner testified that defendant's fingerprint was found on the television (TT II 116, 143). A DNA analyst testified that a baseball cap police found inside the Chrysler had DNA on it with a profile consistent with defendant's DNA profile (TT I 284, II 254). Police found seven live .38 caliber rounds in the console of the Chrysler (TT II 112).
>
> Police suspected a breaking and entering had occurred into said apartment building on Court Street (TT I 267). They made their way to Apartment #9,

where they found Steven Hood, deceased, on the floor between a kitchen and front room (TT II 10). No one else was in the apartment (TT II 12). A pathologist testified that Hood suffered a single fatal gunshot wound to his chest which passed through his lungs and aorta (TT II 166, 169). One bullet was collected (TT II 169). Its path was front to back, right to left, and downward at a range of 12 to 36 inches (TT II 174). Hood's toxicology was found to be positive for Prozac, Vicodin, Morphine, and cocaine metabolite (TT II 177).

Inside Apartment 9, police found an entertainment center from which a television appeared to be missing (TT I 275, II 181). There was a glass cup on the floor with pink liquid inside it (TT I 280). Police searched and found no spent shell casings inside the apartment (TT I 325, II 26). The lead investigator, Det. Marcus Mahan, described the apartment as being in a state of disarray (TT II 181).

A firearm identification expert testified that the gun found on defendant functioned properly (TT III 58). He opined that, based on striation marks, the bullet found inside Mr. Hood was fired from said gun (TT III 59). He testified that the unfired cartridges found inside said Chrysler could be used in said firearm (TT III 61). He could not say they were identical to the spent round that killed Hood (TT III 64). He too testified that a used casing would remain in the gun after it was fired until removed (TT III 67).

Returning to Officer Bender, he testified that, except for "split seconds here or there," both suspects were in his sight as they ran (TT I 306, 320). He testified that he lost sight of McCloud longer than he did defendant (TT I 321). The entire chase lasted about two minutes (TT I 306). Bender retraced the path of the two men as they fled, in an unsuccessful attempt to find spent shell casings (TT I 285). Bender testified that he never saw defendant remove the gun from his pocket, or empty any shell casings, as he fled (TT I 326).

Bender collected defendant's personal items, including a t-shirt he was found with (TT I 286-287, 325). Bender opined that the t-shirt had appeared to be stained with a dry, pink substance. *Id*. Defendant otherwise possessed a lighter, one Swisher Sweet® cigar, and hair items but no contraband, other than the unloaded gun (TT I 291-292). Bender testified that he never observed defendant or McCloud inside the apartment building (TT I 301).

Officers Dickenson and Dumanois responded to the scene. Dickerson saw defendant in Bender's custody and Dumanois saw McCloud in an Officer Howell's custody; no weapon was found on McCloud (TT II 37, 43). Dickenson and Dumanois transported defendant to the police station. According to Dickenson:

> A: [Defendant] Stephens asked if we could take him by his father's home on Cottage Grove.

> Q: And, what did - - what was your response?
> A: I just said - - I asked why. Mr. Stephens stated that he wanted to go back and tell his father goodbye because he wasn't going to see him for a long time [TT II 38-39].

Dumanois testified that he heard the same remark (TT II 44-45).

Police Investigator Mahan observed a small cut to McCloud's face (TT II 212). He observed no injury on defendant (TT II 213). Mahan testified that defendant and McCloud refused to talk with him (TT II 185). Mahan testified that, " ... all the evidence pointed back to Mr. McCloud and Mr. Stephens" (TT II 186). The trial court later instructed the jury that defendant had a right to not speak with police and that they should not consider the testimony from Mahan that the two men chose to make no statement (TT II 216).

Various items were collected from Apartment 9 and examined for prints and DNA (*See gen*. TT II 234-236, III 17, 20-24). Counsel stipulated, " ... that there is nothing conclusively in those [lab] reports that's able to - - to link Mr. Stephens to the apartment" (TT II 195). Investigator Mahan testified that, other than defendant's fingerprint on the television, police had no evidence putting defendant inside the apartment building (TT II 205). No blood was found on defendant or his clothing (TT II 231-232). Defendant's DNA was not found under Hood's nail clippings (TT II 213, 252). The pink liquid found on the floor was compared to the pink stain on defendant's tshirt, via a gas chromatograph/mass spectrometer, and an analyst testified that, while chemically similar, each stain possessed a chemical the other did not (TT II 268). Dozens of photographs of the Chrysler, the exterior and interior of said apartment building, and the interior of Apartment 9 were submitted (TT I 272, II 11).

Other residents of the building were called. Andrew Reese was a friend and neighbor of Hood (TT II 49). He testified that Hood owned the flat screen television found in said Chrysler (TT II 53). Reese identified Hood for police and described Hood's apartment after the shooting as "disheveled" (TT II 56-58). Reese helped clean Hood's apartment after the shooting and found no "shells" (TT II 76). Reese's 'wife,' Mary Woods, heard nothing unusual before she saw the police outside (IT II 84-86).

Julia Montier-Washington was another neighbor of Mr. Hood (TT II 218). From inside her apartment, on the day in question, around noon, she heard what sounded like a man and woman fighting inside Hood's apartment (TT II 220, 222). It was loud enough to cause her to phone her landlord; she then heard what sounded like two firecrackers (TT II 221). Within five minutes the police arrived (TT II 223).

Hood's roommate, his cousin Colmonta Smith, testified that when she left the apartment that morning the television found in said Chrysler was inside Hood's

entertainment center (TT III 36). The temperature was in the 90s and Hood had a habit of leaving his door open to get a breeze (TT III 38-39). She denied knowing defendant or McCloud (TT III 44). Whereas Mr. Reese testified that Hood sold drugs (IT II 69), Smith denied that Hood used or sold drugs (TT III 34, 42). She testified, "As far as I know, [Hood] was taking morphine for mental problems or whatever and whatnot" (TT III 45).

The Defense

The position of the defense was that: defendant was not with McCloud; that he was never inside the apartment building; that he saw the television when driving by; that he tried to put it into his car; that he saw a gun laying nearby and picked it up; that he saw the officer and fled because he was on probation (TT I 246; defense opening).

The defense called Avian Stephens (defendant's brother), Geneva Cook (Avian's girlfriend), and Kiara Whitfield (defendant's girlfriend). All three testified they had never seen defendant with a firearm (TT III 12, 73, 90). All three testified that defendant drove Avian and Geneva to a job fair in the Flint area on the day in question (TT III 7-9, 71-73, 86-87). Avian and Geneva were dropped-off at about 11 :00 a.m. (TT III 9, 73). All three said defendant was driving the Chrysler found outside the apartment building (TT III 12-13, 75, 91).

Avian further testified that there was an innocent explanation for why defendant was at said apartment building - Avian asked defendant to look at a Monte Carlo parked outside the building because he was interested in purchasing it (TT III 74, 76-77). Kiara further testified that she was the owner of said Chrysler (TT III 84). She was with defendant when he dropped-off Avian and Geneva, and then left her at her cousin's home at 11 :30 a.m. (TT III 86-87). Defendant was to return at 2:00 p.m. (TT III 88).

The defense called Officer Steve Howell who repeatedly admitted that, during defendant's preliminary examination, he repeatedly testified that he took defendant into custody and that defendant had no weapon on him (TT III 103, 107, 109, 114). He testified at trial that he was mistaken, that he had taken McCloud into custody (TT III 104, 122). He blamed the purported error on the fact that his subpoena had defendant's name on it and he was distracted by a hunting trip he had planned (TT III 116, 122). He testified:

> A: I made a mistake.
> Q: Because you was [sic] in a hurry to take your kid hunting?
> A: Absolutely
> Q: And even when the prosecutor showed you your report you told him that the report was wrong 'cause it Mr. Stephens who you apprehended, correct?
> A: I said I made a mistake [TT III 126].

> Rebuttal
>
> Officer Dumanois testified that he saw Officer Howell with McCloud, not defendant, when he arrived at the scene (TT 141-142). McCloud wore a white tank top, blue jeans, black baseball hat and black Nikes whereas defendant had no shirt on, and wore blue jeans, white and grey high tops and a large wristwatch (TT III 141, 143).
>
> Conclusion
>
> Outside the presence of the jury, the defendant was told that he had a right to testify (TT III 128). Defense counsel told the court that defendant decided to not testify (TT III 137).

Def. App. Br. 1–7 (footnotes omitted).

Following his convictions and sentencing, Stephens filed an appeal of right with the Michigan Court of Appeals raising the same claims presented on habeas review. The Michigan Court of Appeals denied relief on those claims and affirmed Stephens's convictions. *People v. Stephens*, No. 310243, 2013 WL 3942562 (Mich. Ct. App. July 30, 2013). Stephens then filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Stephens*, 495 Mich. 915 (2013).

Stephens filed his federal habeas petition in February 2015. Respondent has since filed an answer to the petition and the state court record. ECF Nos. 7, 8.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, provides the standard of review for federal habeas cases brought by state prisoners. The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). But for a federal court to find a state court's application of Supreme Court precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous — its application must have been "objectively unreasonable." *See Wiggins*, 539 U.S. at 520–21. "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations omitted).

The United States Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could

disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal citation and quotation marks omitted). The Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* A habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. To obtain federal habeas relief, a state prisoner must therefore show that the state court's rejection of a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

Section 2254(d)(1) limits a federal court's review to determining whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412. Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100, nor does it "require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Because the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" and "[i]t therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam).

Lastly, a state court's factual determinations are presumed correct on federal habeas review. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## ANALYSIS

A. Sufficiency of the Evidence

Stephens first asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence to support his convictions. Specifically, he asserts that the prosecution failed to establish that he was in the apartment at the time of the crime and evidence was therefore insufficient to establish malice and participation in a robbery. Respondent contends that this claim lacks merit.

The federal due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The question on a sufficiency-of-the-evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The *Jackson*

standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16).

A federal habeas court views this standard through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). A sufficiency-of-the-evidence challenge under the AEDPA must therefore "survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review: the factfinder at trial and the state court on appellate review — provided those determinations are reasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). Accordingly, the "mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Id.* at 788–89.

Under Michigan law, a person who commits murder during the perpetration of a felony is guilty of first-degree murder. Mich. Comp. Laws § 750.316. The elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in the statute. *See Matthews*, 319 F.3d at 789 (citing *People v. Carines*, 460 Mich. 750, 759

(1999)). The facts and circumstances of the killing may give rise to an inference of malice, including evidence that the defendant used a deadly weapon. *Id*. The elements of the underlying felony of armed robbery are: (1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute. *See* Mich. Comp. Laws § 750.529; *People v. Rodgers*, 248 Mich. App. 702, 707 (2001). Identity is an element of every offense. *People v. Yost*, 278 Mich. App 341, 356 (2008). Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, including identity and intent or state of mind*. See People v. Nowack*, 462 Mich. 392, 399–400 (2000); *People v. Dumas*, 454 Mich. 390, 398 (1997) (intent); *People v. Jolly*, 442 Mich. 458, 466 (1993) (same); *People v. Kern*, 6 Mich. App. 406, 409–10 (1967) (identity). The use of a lethal weapon supports an inference of an intent to kill. *People v. Turner*, 62 Mich. App. 467, 470 (1975).

Applying the *Jackson* standard, the Michigan Court of Appeals ruled that the prosecution presented sufficient evidence to support Stephens's convictions. The court explained in relevant part:

> After reviewing the trial evidence, we conclude that there was sufficient evidence to support defendant's convictions. A rational trier of fact could conclude that defendant was in the victim's apartment, he participated in taking the television from the victim's apartment, and he shot the victim in the process. Flint Police Sergeant David Bender saw defendant and another male near a white Chrysler Sebring parked by the apartment complex on July 7, 2010 around 12:45 pm. Each had his shirt around his face like a mask, and Bender saw the handle of a gun sticking out of defendant's pocket. When Bender stopped his patrol car, the two men ran.
>
> When defendant was detained and arrested, he still had the gun, a .357–caliber Magnum revolver, in his front pocket and his shirt was around his shoulder. The trunk of the Chrysler contained a flat screen television, and defendant's fingerprint was found on the television. The door to the apartment building was

ajar, and the victim's body was found in apartment nine. The victim's apartment was disheveled and the television was missing from the entertainment center. The shirt defendant had when arrested had a pink stain on it, and police found an overturned cup containing a pink substance in the victim's apartment. The pink stain on the shirt and the pink liquid in the cup were both food items and, although they contained many of the same compounds, each also contained one component not found in the other item. The expert who tested the two substances stated that the stain on the shirt could have been contaminated by other materials from the shirt. He could not say whether or not the stain was made by the liquid found in the apartment.

In addition, the bullet removed from the victim and the test bullet fired from the revolver that defendant possessed when arrested showed similar tool marks, indicating that the bullet that killed the victim was fired from the gun defendant possessed. Inside the white Chrysler Sebring, police found several live .38–caliber Special rounds, which could be fired from a .357–caliber Magnum gun. The bullet removed from the victim was also in the .38–caliber class. The jury could infer malice from the use of the gun and the fact that defendant engaged in the armed robbery. *Carines*, 460 Mich at 759, 761 n. 5.

Moreover, several witnesses indicated that he was driving his girlfriend's white Chrysler Sebring that day. Defendant also made incriminating statements when he asked the police if they could "take him by his father's home" because defendant wanted to tell his father "goodbye because he wasn't going to see him for a long time."

Although defendant points to testimony by a different officer who admitted that he mistakenly testified at the preliminary examination that defendant was the suspect he arrested on July 7, 2010, and the suspect did not have a gun, the officer clarified at trial that he was mistaken and he actually arrested the other suspect, not defendant. We resolve any conflicting evidence in favor of the jury's verdict and we decline to disturb the jury's resolution of credibility issues. *People v. Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000); *Harrison*, 283 Mich App at 377–378.

In addition, defendant's assertion that the other man must have had the gun used to kill the victim contradicted the trial evidence. The other man did not have a gun in his possession when arrested; only defendant did. Moreover, the test bullet fired from defendant's gun showed similar striation marks to the bullet found in the victim. Drawing all reasonable inferences in support of the verdict, this strongly suggested that defendant's gun was the one used to kill the victim. *Wolfe*, 440 Mich at 515.

Defendant also argues that Bender never saw defendant discard any shell casings and there were no casings in the gun when defendant was apprehended, suggesting that someone else shot the victim. The prosecution

> is not required to disprove "every reasonable theory consistent with innocence. Instead, the prosecution is bound to prove the elements of the crime beyond a reasonable doubt.... [The prosecution] need only convince the jury 'in the face of whatever contradictory evidence the defendant may provide.'" *Nowack*, 462 Mich at 400, quoting *People v. Konrad*, 449 Mich 263, 273 n. 6; 536 NW2d 517 (1995). Under the circumstances, the jury could reasonably have concluded that defendant disposed of any spent shell casings before Bender arrived. The fact that none were found does not render the case against defendant insufficient.

*Stephens*, 2013 WL 3942562 at *1–3 (footnote omitted).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or determination of the facts. The police testimony describing Stephens's suspicious appearance and conduct near the scene, Stephens's possession of the gun with the expert testimony linking it to the murder, the stain on Stephens's shirt being similar to liquid spilled in the victim's apartment, and Stephens's fingerprint on the stolen television, along with reasonable inferences therefrom, was sufficient to support a finding that Stephens committed the armed robbery and the murder. Although some of the evidence against Stephens was circumstantial, considered together with the other evidence, it was sufficient to support his convictions. *See, e.g.*, *Britt v. Howes*, No. 09-1597, 2010 WL 5135618, *3 (6th Cir. Dec.16, 2010) (unpublished) (confirming that circumstantial evidence alone is sufficient to sustain a conviction and deny habeas relief); *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) (concluding that circumstantial evidence can be sufficient to sustain a conviction and stating that such evidence "need not remove every reasonable hypothesis except that of guilt").

Stephens challenges the credibility of the witnesses and the inferences the jury drew from the testimony presented at trial, but it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts. The jury's verdict, and the Michigan Court of Appeals' decision affirming that verdict, were reasonable. The evidence presented at trial,

viewed in a light favorable to the prosecution, established beyond a reasonable doubt that Stephens committed the crimes. Habeas relief is not warranted on this claim.

B. Effectiveness of Trial Counsel

Stephens also asserts that he is entitled to habeas relief because his trial counsel was ineffective for failing to object to Flint Police Lieutenant Marcus Mahan's testimony that he did not pursue other suspects because "all the evidence pointed back to" Stephens and Curtis McCloud. Stephens believes that the investigating officer's testimony was an improper comment on his guilt. Respondent contends that this claim lacks merit.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id*.

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance." *Id*. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 689. There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner

bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Id*. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Id.* at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland'*s deferential standard." *Id*.

The Michigan Court of Appeals cited the *Strickland* standard when it denied relief on Stephens's ineffective-assistance claim. The court found that Stephens failed to show that trial counsel erred or that he was prejudiced by counsel's conduct. It explained:

> In the present case, the prosecutor questioned Flint Police Lieutenant Marcus Mahan, the officer in charge of investigating the case, regarding the gathering of DNA evidence, sending evidence in for testing, receiving reports from the laboratory, interviewing witnesses, and other actions he took as part of his investigation of the case. The prosecutor asked whether he had any other suspects in the case or whether he pursued any other suspects, and Mahan

indicated that he did not. When the prosecutor asked why Mahan did not pursue any other suspects, he responded that "[t]here was [sic] no other suspects that we were advised of and all our—all the evidence pointed back to [defendant and the other man arrested that day]."

Opinion testimony by a lay witness is generally permitted if it is rationally based on the perception of the witness and helpful to the jury in gaining a clear understanding of testimony or a fact in issue. MRE 701. Nevertheless, "the issue of an accused's guilt or innocence is a question for the trier of fact." *People v. Bragdon*, 142 Mich App 197, 199; 369 NW2d 208 (1985). *See also People v. Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007) (A witness may not comment on another witness's credibility because credibility issues are for the jury to decide.).

Defense counsel did not render ineffective assistance in the present case. The prosecutor did not state that, in her personal opinion, defendant was guilty. *See People v. Humphreys*, 24 Mich App 411, 418–419; 180 NW2d 328 (1970) (A prosecutor may not argue to the jury that he personally believes that the defendant is guilty or that the defendant would not be on trial if the prosecutor or police believed that the defendant was innocent). Nor did the challenged questions and testimony imply that the prosecutor had some special knowledge about Mahan's truthfulness. *People v. Bennett*, 290 Mich App 465, 476–478; 802 NW2d 627 (2010).

Mahan likewise did not offer his personal opinion regarding defendant's guilt. Rather, his testimony related the actions he took with respect to his investigation. Under similar circumstances, this Court found no error when the prosecutor questioned the officer in charge about his investigation after defense counsel inquired whether the officer had shown witnesses pictures of other suspects. *People v. Moreno*, 112 Mich App 631, 635–636; 317 NW2d 201 (1981). As in Moreno, the prosecutor's questions in the present case responded to defendant's assertion that the police focused him as a suspect because they could not catch the "real two guys" who were responsible. *Id*. at 635. Similarly, in *People v. Heft*, 299 Mich App 69, 81–83; 829 NW2d 266 (2012), this Court concluded that the defendant's counsel did not render ineffective assistance by failing to object to the officers' testimony that they believed the defendant's statement (that he was out for a walk) was untruthful, unreasonable, and did not make sense given that it was 1:30 a.m. and zero degrees outside. This Court held that the testimony did not constitute improper opinion about the defendant's guilt because it explained their investigation from their personal perceptions. *Id*.

Accordingly, defendant has failed to demonstrate that counsel's performance was deficient. *Trakhtenberg*, 493 Mich at 51. Because the prosecutor's questions and Mahan's responses were proper, counsel was not required to raise a futile motion or objection. *People v. McGhee*, 268 Mich App 600, 627–629; 709 NW2d 595 (2005). Moreover, as stated supra, ample evidence

> connected defendant to the crimes; defendant has not demonstrated a reasonable probability that the outcome would have been different, even assuming for the sake of argument that counsel should have objected.

*Stephens*, 2013 WL 3942562 at *3–4.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or determination of the facts. Stephens cannot establish that trial counsel erred or that he was prejudiced by counsel's conduct because Lieutenant Mahan's testimony was properly admitted under state law and its admission did not violate due process. Under Michigan law, lay opinion testimony is admissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Mich. R. Evid. 701. The opinions and reliable conclusions of investigating police officers who have not been qualified as experts have also been deemed admissible under Michigan law when the testimony is based upon observations and not dependent upon scientific expertise. *See People v. Oliver*, 170 Mich. App. 38, 49–50 (1988).

Here, Mahan did not offer a personal opinion about Stephens's guilt; rather he discussed the actions that he took (and did not take) in investigating the crime. Mahan's testimony that he did not pursue other suspects because all the evidence pointed to Stephens and McCloud was thus appropriate to explain his investigation and to assist the jury in resolving the factual issues at trial. Counsel cannot be deemed ineffective for failing to raise a meritless claim or objection. *Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010); *Bradley v. Birkett*, 192 F. App'x 468, 475 (6th Cir. 2006). Moreover, even if counsel erred, Stephens cannot establish that he was prejudiced by counsel's conduct given the

significant evidence of guilt presented at trial. Stephens fails to establish that trial counsel was ineffective under the *Strickland* standard. Habeas relief is not warranted on this claim.

**CONCLUSION**

The Court concludes that Stephens is not entitled to federal habeas relief on his claims and that his habeas petition must be denied.

Before Stephens may appeal the Court's decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A federal district court must issue or deny a certificate of appealability when denying relief. Rule 11(a) of the Rules Governing 2254 Cases, 28 U.S.C. foll. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Having conducted the requisite review, the Court concludes that Stephens fails to make a substantial showing of the denial of a constitutional right as to his habeas claims and will therefore deny a certificate of appealability. The Court likewise deny leave to proceed *in forma pauperis* on appeal because an appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a).

**ORDER**

**WHEREFORE** it is hereby **ORDERED** that the petition for a writ of habeas corpus (document no. 1) is **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that Stephens is **DENIED** leave to appeal in forma pauperis.

**SO ORDERED.**

                                  s/Stephen J. Murphy, III
                                  STEPHEN J. MURPHY, III
                                  United States District Judge

Dated: November 29, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 29, 2016, by electronic and/or ordinary mail.

                                  s/David P. Parker
                                  Acting Case Manager